# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARVIN JOHNSON,<br><br>    Petitioner,<br><br>    v.<br><br>RALPH M. DIAZ, Warden, California Substance Abuse Treatment Facility,<br><br>    Respondent. | Case No. 1:12-cv-01210-SKO  HC<br><br>ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS<br><br>(Doc. 1) |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] Petitioner contends (1) that the evidence was insufficient to support Petitioner's conviction of violating California Penal Code § 186.22(a) and (b) (participation in a street gang), violating his right to due process, and (2) that by failing to raise an issue of ineffective assistance of trial counsel in his direct appeal, his appellate counsel provided ineffective assistance of counsel.

## I.   Factual and Procedural Background[2]

On the afternoon of April 5, 2010, Bakersfield police officers went to the Western Night Inn[3] to contact Petitioner in the course of their investigation of an assault at the motel. Upon arrival at

---

[1] Pursuant to 28 U.S.C. § 636(c)(1), both parties consented, in writing, to the jurisdiction of a United States Magistrate Judge to conduct all further proceedings in this case, including the entry of final judgment.

[2] Background information in this section is derived from the opinion of the California Court of Appeal, Fifth Appellate District on direct appeal (*People v. Johnson*, No. F060744 (Cal.Ct.App. Aug. 1, 2011)).

[3] Various witnesses and trial court documents also refer to the motel by its prior name: the Night's Rest Inn.

1

Petitioner's room, the window was partially covered by a sheet, but through the uncovered portions, officers could observe Petitioner sitting on the bed and an off-white substance, which appeared to be drugs, on a chair next to the door. The officers made eye contact with Petitioner, and he jumped up. Officers then entered the room immediately, expecting that he would attempt to dispose of the drugs.[4]

After detaining Petitioner, officers observed numerous items that suggested that Petitioner was selling crack cocaine base from the room.  They seized large amounts of cash, pay-and-go sheets, and 32 individual bindles of cocaine base.[5]

On April 27, 2010, the Kern County District Attorney charged Petitioner with (1) assault with a deadly weapon (California Penal Code § 245(a)(1)); (2) possession of cocaine base for sale (California Health and Safety Code § 11351.5); and (3) active participation in a street gang (California Penal Code § 186.22(a)).  The information also alleged that counts one and two were committed for the benefit of a criminal street gang within the meaning of California Penal Code § 186.22(b)(1), and alleged particulars of Petitioner's prior convictions (California Penal Code §§ 667(a); 667(b)-(i); and 1170.12 (a)-(d)).  The prosecutor dismissed count one on June 21, 2010. Petitioner's jury trial began on June 24, 2010, with the issue of prior conviction allegations bifurcated.

On June 30, 2010, the jury found Petitioner guilty of both remaining counts and found the gang enhancement to be true.  Following the separate trial, the prior conviction allegations were also found to be true.  The prosecutor dismissed the prior prison term allegation.  On July 29, 2010, the court sentenced Petitioner to an aggregate term of nineteen years.

On August 4, 2010, Petitioner filed a notice of appeal.  He contended that (1) the evidence was insufficient to support his convictions and (2) that the insufficiency of the evidence constituted a

---

[4] Another individual, Gaytonia James, was also present in Petitioner's room.

[5] A substantial additional amount of rock cocaine was discovered hidden under the bed.

2

violation of Petitioner's due process rights under the Fourteenth Amendment to the U.S. Constitution. The California Court of Appeals, Fifth Appellate District, affirmed the convictions on August 1, 2011. On May 18, 2012, Petitioner attempted to file an untimely appeal[6] to the California Supreme Court, which the Court refused to consider for lack of jurisdiction.

On July 5, 2012, Petitioner filed a writ of habeas corpus with the California Supreme Court, charging ineffective assistance of appellate counsel based on counsel's failure to claim ineffective assistance of trial counsel in Petitioner's direct appeal. The California Supreme Court denied the writ on October 10, 2012.

On July 25, 2012, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## II. Standard of Review

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court,

///

---

[6] Under California law, the last day on which Petitioner could have appealed the decision of the California Court of Appeals to the California Supreme Court was September 30, 2011. Doc. 10 at 2.

3

subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

### III. Sufficiency of the Evidence of Gang Involvement

Petitioner contends that the evidence supporting the finding that he violated California Penal Code § 186.22(a) and (b) (participation in a street gang) was constitutionally insufficient, violating

4

his due process rights. Respondent contends that, since Petitioner did not pursue his direct appeal to the California Supreme Court, he failed to exhaust this claim.

### A.    Failure to Exhaust

The AEDPA requires a petitioner in state custody to exhaust his claims in state court before filing a federal habeas petition. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine requires a petitioner to give the state courts one full and fair opportunity to rule on his federal claims before he brings them to federal court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). *See also Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996). The exhaustion doctrine is based on comity with the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509, 518 (1982); *Buffalo v. Sun*, 854 F.2d 1158, 1162-63 (9th Cir. 1988). The highest state court has had a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis. *Duncan v. Henry*, 513 U.S. 364, 365 (1995). Although the petition initially reported that Petitioner had filed his direct appeal with the California Supreme Court, Petition implicitly conceded that he did not do so, moving for stay and abeyance to allow him to exhaust the due process claim. Before this Court addressed the motion for stay, the California Supreme Court refused to consider the untimely appeal for lack of jurisdiction.

If the petitioner has failed to present any of his claims to the highest state court, as required by the exhaustion doctrine, the Court must dismiss the petition. *Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006); *Jiminez v. Rice*, 276 F.3d 478, 481 (9th Cir. 2001). As discussed below, under this standard, the Court must dismiss this petition for writ of habeas corpus.

### B.    Sufficiency of Evidence

"An application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. §

2254(b)(2). Because exhaustion is a matter of comity, not jurisdiction, a federal court may consider unexhausted claims in a mixed petition when those claims "clearly do not rise to the level of alleged deprivations of constitutional rights." *Acosta-Huerta v. Estelle*, 7 F.3d 139, 142 (9th Cir. 1992) (quoting James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 9.3(b) at 122 (1988)). Because a review of the record reveals that no fair-minded jurist could disagree that the evidence was sufficient to prove Petitioner's participation in a street gang, the Court elects to address this claim on its merits.

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[7] *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998). It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the trier of fact could reasonably have reached its verdict. *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991).

**1.     Applicable State Standard**

Contending only that the evidence was insufficient to convict him, Petitioner does not challenge the substantive state law applicable to Section 186.22, as set forth by the California Court of Appeals:

> To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and that the defendant had the specific intent to promote, further, or assist in any criminal conduct by gang

---

[7] Petitioner moved the Court to take judicial notice of *People v. Le*, 61 Cal.4th 416 (2015), as relevant to the sufficiency of the evidence presented to convict Petitioner of participation in a street gang. *Le*, addressing application of weapon and gang enhancements in sentencing, is inapposite.

6

members . . . ."  (§ 186.22, subd. (b)(1).)  The crime must be "gang related." (*People v. Gardeley* (1996) 14 Cal.4th 605, 622, 625, fn. 12; *People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Castenada* (2000) 23 Cal.4th 743, 745[gang enhancement statute "increases the punishment for some gang-related crimes"]; *People v. Mendez* (2010) 188 Cal.App.4th 47, 56 [gang enhancement statute "applies when a crime is gang related"].)  "Not every crime committed by gang members is related to a gang."  (*People v. Albillar*, *supra*, at p. 60.)  A defendant's mere membership in the gang does not suffice to establish the gang enhancement.  (*People v. Gardeley*, *supra*, at pp. 623-624; *In re Frank S.*, [(2006) 141 Cal.App.4th 1192], 1199.)  Rather, "'[t]he crime itself must have some connection with the activities of the gang.'"  (*In re Frank S., supra*, at 1199; accord, *People v. Martinez* (2004) 116 Cal.App.4th 753, 762 [§186.30 context].)

The prosecution must also prove "that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period."  (*People v. Gardeley, supra*, 14 Cal.4th at p. 617, italics omitted.)  Defendant does not challenge the evidence concerning these elements, and thus implicitly concedes the sufficiency of the evidence supporting them.

"[T]o prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs. [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048; *People v. Ferraez, supra*, 112 Cal.App.4th at p. 930 ["It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a . . . finding on a gang allegation"].)  "Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth." [Citation.]  Such a hypothetical question must be rooted in the facts shown by the evidence, however.  [Citations.]' [Citation.]" (*People v. Ward* (2005) 36 Cal.4th 186, 209.0  But "[a] gang expert's testimony alone is insufficient to find an offense gang related." ("*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.)  Rather, the expert testimony must be accompanied by some substantive evidentiary basis from which the jury could reasonably infer the crime was gang related.  (*Id.* at p. 660 ["something more than an expert witness's unsubstantiated opinion that a crime was committed for the benefit of, at the direction of, or in association with any criminal street gang is required to justify a true finding on a gang enhancement."];  *People v. Ramon* (2009) 175 Cal.App.4th 843, 852; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198;  *People v. Ferraez*, *supra*, at p. 931.)

*People v. Johnson*, F060744 at *5-7 (Cal.Ct.App. Aug. 1, 2011).

///

///

### 2. **Testimony at Trial**

Bakersfield Police Department Detective Martin Heredia, an eighteen-year veteran of the force, testified that in 2000, he was assigned to the special enforcement (gang) unit. Members of the unit completed field interview (FI) cards whenever they had contact with a gang member that did not result in an arrest. Intended to document individuals who were repeatedly contacted by gang unit officers, the three-by-five-inch card allowed the officer to fill in the blanks with information about a gang member, such as name, address, birthday, social security number, physical description (height, weight, hairstyle, facial hair), tattoos, individuals he was associated with at the point of contact, vehicle information, clothing description, and whether the individual claimed to be part of any gang. When Detective Heredia encountered Petitioner at 700 P Street in February 2000, Petitioner told Heredia that he was a member of the Junior Mafia, a subset of the West Side Crips, and that his moniker was "Little Nutty." Petitioner then resided at 308 Donna in Bakersfield.

While assigned to the gang unit in December 2005, Bakersfield Police Department Detective Richard James Dossey, Jr., encountered Petitioner after observing suspicious activity at the rear of 145 T Street in Bakersfield. Two suspects escaped; two other suspects, one of whom was Petitioner, were apprehended. Detective Dossey prepared a street check, which is a computerized version of the FI card. Petitioner told Dossey that he was a member of the West Side Crips but was no longer "banging," that is, participating in the street gang. Detective Dossey minimized the value of Petitioner's denial, explaining that gang members frequently disclaim current activity to avoid the possibility of additional gang charges in the future.

Officer Richard Bittleston, a five-year veteran of the Bakersfield Police Department, encountered Petitioner on June 27, 2007, while responding to an incident on Planz Road. Petitioner told Bittleston that he was a member of the West Side Crips.

///

8

Patrol Officer Theodore King encountered Petitioner in April 2007, while King was assigned to the gang unit. Petitioner told King that he was a member of the West Side Crips. In response to King's inquiry, Petitioner acknowledged that he had gang tattoos and showed them to Officer King. One tattoo bore the number "805," the old area code for Bakersfield, and the phrase "original ridah." Another showed a person with the letters WSC and the word "Lowell." Petitioner told King that WSC stood for West Side Crips. Lowell Park, also called Fourth Street Park, is the largest park within the territorial boundaries of the West Side Crips and is frequently used for gang gatherings. Petitioner told King that both tattoos were common among members of the West Side Crips.

Bakersfield Police Officer Ryan Kroeker testified as a gang expert for the prosecution. He was a two-year veteran of the gang unit, received specific gang training in the police academy and participated in conferences conducted by the California Gang Investigators Unit. He was also a member of the Kern County Gang Investigators Association. Officer Kroeker contacted members of Bakersfield's street gangs on a daily basis. He participated in patrol units composed solely of Bakersfield police officers as well as units composed of officers from multiple law enforcement agencies. He regularly participated in arrests of gang members and execution of search warrants. Kroeker estimated that he had participated in close to 50 investigations involving members of the West Side Crips.

Kroeker agreed with the other police witnesses that many of his contacts with members of the West Side Crips did not involve investigations or arrests. He explained:

> [A] lot of times, just by speaking with gang members, that's a source of information for us. We talk to them. Oftentimes they'll provide us information on current rivalries or trends or hangout spots that was going on. A lot of times we'll talk to them about recent gang-related possible shootings or stabbings or crimes that we are investigating. And by speaking with them, you can gather information that can help us as a whole try to put our hands on the gang problem.

Transcript, vol. 7, at 429-30 (June 28, 2010).

///

9

Kroeker testified that in relaxed conversations, gang members would often volunteer information about ongoing activities or the whereabouts of other gang members. But he added that information gained in such informal contacts could not always be accepted at face value. On cross-examination, Kroeker testified that most gang members would not talk informally to police officers. When the officers of the gang unit pooled their information and applied experience and common sense, the information could provide insight on the current status of Bakersfield's street gangs.

The largest and most violent gangs in Bakersfield and the surrounding countryside were the West Side Crips, East Side Crips, Country Boy Crips, Loma Bakers, Colonia Bakers, and Varrio Bakers. The Crips gangs were predominately composed of African-American individuals; the Bakers gangs were predominately composed of Hispanic individuals. The West Side Crips had about 200 members. In Kroeker's experience, the West Side Crips' primary ongoing activities were murder, stabbings, shootings, burglaries, robberies, illegal drug sales, witness intimidation, and terroristic threats.

All of the gangs had established territories. The territory traditionally claimed by the West Side Crips ran from Union Avenue on the east to H Street on the west, and from California Avenue on the north to Brundage Lane on the south.

According to Kroeker, young gang members are recruited by older friends and relatives. As a result, a young gang member was likely to have joined the gang in whose territory he lived. Kroeker confirmed that the various locations where the other officers had encountered Petitioner and the addresses where he lived were located within West Side Crips territory.

The primary color of the West Side Crips is turquoise, although members no longer habitually wore their colors while conducting gang business. Kroeker opined that gang members realized that law enforcement was looking for gang colors and sought "to throw us off as law enforcement." Transcript, vol. 7, at 437 (June 28, 2010). Gang colors continued to be worn to build

///

10

status and show pride, however, and members would wear them for occasions such as an assault on another gang.

The Western Night Inn was located at 505 Union in Bakersfield, on the eastern boundary of West Side Crips territory. Kroeker had made contacts and arrested West Side Crips members and their allies, the Country Boy Crips, at the Western Night Inn. The Western Night Inn was the location of frequent drug transactions, and West Side Crips members were comfortable there since it was within their territory. Kroeker opined that if an individual without association or family ties to the West Side Crips attempted to sell illegal drugs at the Western Night Inn, the enterprise would not proceed smoothly. Unless that individual had paid money to the West Side Crips for the privilege of selling drugs there, he was likely to be beaten, shot, or stabbed. Kroeker had personally responded to shootings and stabbings at the Western Night Inn.

Kroeker testified to the West Side Crips' predicate offenses, as required by California law. He identified illegal narcotics sales by member Tommy Thomas (case no. BF130415A) from his apartment at 731 V Street; cocaine sales by member Ira Jones (case no. BF129865A) at 825 R Street; and sales of illegal narcotics at the Western Night Inn by member Demetric Watson (case no. 129279A).

Kroeker opined that at the time of his arrest, Petitioner was an active member of the West Side Crips. To reach his conclusion, Kroeker reviewed information on Petitioner's tattoos, street checks and field identification cards, booking information, and offense reports in which Petitioner was identified.

Petitioner was booked eight times from June 24, 2002, through his arrest in the pending case. Each time, Petitioner identified himself as a member of the West Side Crips.[8]

///

---

[8] Upon booking into jail, gang members typically identify their gang affiliation to avoid being housed where hostile rivals could harm them.

11

Kroeker reviewed seven street checks of Petitioner and found six to be significant indicators of Petitioner's active gang status, based on the location of contact, the persons he was with upon contact, and the statements that Petitioner made to the contacting officer.  Similarly, in reviewing thirteen offense reports, Kroeker found nine to be significant indicators of current gang activity based on location, type of crime committed, and others with whom he was associated in the offense. Two prior offenses other than the pending offense had occurred at the Western Night Inn.

Kroeker explained the significance of Petitioner's gang-related tattoos.  The tattoo on Petitioner's left arm included Bakersfield's former area code, 805, and the phrase "original ridah." "Ridah" is a misspelling of "rider."  In gang parlance, a rider is a member who will go out to commit shootings and stabbings.  A tattoo on Petitioner's right shoulder depicted a little angel with the letters "WSC," for West Side Crips, and "Lowell Park," a gang hangout at Fourth and P Streets. Lowell Park held sentimental value to West Side Crips members -- it is the site of the gang's annual "hood day," where old and current gang members join together.

Finally, the prosecutor asked Officer Kroeker:

> Hypothetically, you have an active member of the West Side Crips selling narcotics at 505 Union Avenue, the Night's Rest Inn.  The narcotic—there has previously been an opinion that the cocaine base was possessed for purposes of sale.  Do you have an opinion about whether or not that activity would be done for the benefit of or in association with the West Side Crips?

Transcript, vol. 7, at 454-55 (June 28, 2010).

Kroeker opined that the sale of narcotics, as expressed in the hypothetical, would have been done for the benefit of and in association with the West Side Crips.  His conclusion was based on a violation located within gang territory at which members would feel comfortable and in control.  He added that narcotics sales were one of the primary ways that the West Side Crips financed their gang activities.

///

///

12

### C. Conclusion

Based on the foregoing, no fair-minded jurist could disagree that the evidence was sufficient to prove Petitioner's participation in a street gang.

## IV. Ineffective Assistance of Appellate Counsel

Petitioner claims that his counsel for his direct appeal provided ineffective assistance by failing to raise the meritorious issue of his trial attorney's ineffective assistance of counsel. Respondent replies that this claim lacks merit. The Court agrees.

### A. Standard of Review

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland* test requires Petitioner to establish two elements: (1) his attorney's representation was deficient and (2) prejudice. Both elements are mixed questions of law and fact. *Id.* at 698.

These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

///

### B. <u>Ineffective Assistance on Direct Appeal</u>

Maintaining that he had completely covered the window and door of his room at the Western Night Inn, Petitioner contends that Bakersfield Police Officer Daniel Champness lied about the officers' ability to see the illegal drugs in plain sight. Consequently, the police entry into his motel room was illegal, and the evidence seized should have been suppressed. Petitioner maintains that his trial counsel provided ineffective assistance by failing to pursue the motion to suppress the fruits of the illegal entry and asserts, as his second ground for a writ of habeas corpus, that his appellate counsel provided ineffective assistance on his direct appeal by failing to pursue his claim of ineffective assistance of trial counsel. "Appellate counsel ignored this meritorious claim of I.A.C. of trial counsel and this meritorious claim is clearly stronger that the prior claims that appellate counsel presented on direct appeal." Doc. 1 at 12.

Petitioner supports his claim with his own declaration that he advised appellate counsel of his meritorious claim of ineffective assistance of trial counsel. Correspondence between Petitioner and appellate counsel, submitted as exhibits to the declaration in a supplement to Petitioner's traverse, contradict Petitioner's understanding of appellate counsel's actions. Appellate counsel, attorney Barbara Coffman, explained to Petitioner that she was unable to pursue the ineffective assistance of counsel claim in the direct appeal and offered to assist him in filing a separate habeas petition and motion for appointment of habeas counsel.

In a letter dated June 21, 2011, Ms. Coffman wrote to Petitioner:

> Enclosed is the form for a Petition for Writ of Habeas Corpus. When you get to number 6, Grounds for Relief, as I understand your argument, Ground 1 should state "ineffective assistance of counsel for failure to file a motion to suppress and call relevant witnesses." Then under supporting facts what the hotel manager would testify to and that you told your attorney to interview and call the hotel manager and that your attorney failed to do this. Because you are required to state facts only, you will need a declaration from the hotel manager stating would she testify to under oath . . . . .

///

> After you have completed the Petition, you can send it back to me and I will make sure it is correct. I will then send it back to you with the necessary envelopes for filing.
>
> If you have any questions, please contact me.

Doc. 33 at 3.

Instead of ignoring Petitioner's claim, Ms. Coffman acknowledged it and offered Petitioner assistance in bringing the claim in a petition for habeas corpus. Her course of action was legally appropriate. When "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim on appeal must be rejected." *People v. Wilson*, 3 Cal.4th 926, 936 (1992) (quoting *People v. Pope*, 23 Cal.3d 412, 426 (1979)). "To promote judicial economy in direct appeals where the record contains no explanation, appellate counsel who wish to raise the issue of inadequate trial representation should file a verified petition for writ of habeas corpus." *Wilson*, 3 Cal.4th at 936 (1992) (quoting *Pope*, 23 Cal.3d at 426).

In a September 8, 2011 letter, Ms. Coffman repeated her offer of assistance and explained that the issue could not be raised in the direct appeal but could be raised in a petition for habeas corpus, which she was not authorized to pursue on Petitioner's behalf:

> As I stated in my prior letter, I am only permitted, under my appointment, to request review when unique issues of law are present. If I had believed there was an issue to raise, I would have already done so.
>
> Additionally, the issue you most wanted to raise--the failure of your attorney to introduce evidence at the motion to suppress can only be handled by way of a petition for writ of habeas corpus. While that is not part of my appointment, I have offered to review your petition, provide you with corrects [sic] and additions as needed, and provide you with the necessary envelopes addressed to the appropriate court and a request for appointment of an attorney. You need to do the initial work yourself and obtain declarations that support your contention.

Doc. 33 at 4.

The record does not reveal the extent to which Petitioner availed himself of Ms. Coffman's offer of assistance.

Simply put, Petitioner's own exhibits demonstrate that appellate counsel's representation was reasonable and professional, and that Ms. Coffman offered to assist Petitioner in proceeding *pro se* in preparing a petition for writ of habeas corpus since the petition was outside the scope of her appointment.  Petitioner cannot prevail on a claim of ineffective assistance of appellate counsel.

### C.      Ineffective Assistance of Trial Counsel

Although both Petitioner and Respondent set forth detailed analysis of the suppression motion that forms the basis of Petitioner's contention of trial counsel's ineffective assistance, Petitioner did not advance trial counsel's ineffective assistance as grounds for a writ of habeas corpus before this court or before the California Supreme Court.  Accordingly, this Court will not address that issue.

Trial counsel's handling of the suppression motion is relevant to the question of the adequacy of appellate counsel's assistance only to the extent that Petitioner's argument is premised on his belief that the trial counsel's inadequacy was clearly a meritorious issue.  The record is completely silent about whether the motel manager or anyone other than Petitioner or Gaytonia James, who was in Petitioner's motel room when he was arrested, could have given testimony consistent with Petitioner's claim that the windows to his room were fully covered.  Neither the record nor the state and federal habeas petitions provide any insight into trial counsel's interactions with Petitioner about counsel's preparation for the suppression motion including, but not limited to, the nature and extent of trial counsel's efforts to identify witnesses who could support it.  Nothing in the record supports Petitioner's assertions that the motel manager, whom trial counsel failed to contact, could have testified regarding the extent to which Petitioner's window(s) were covered just prior to his arrest.

On the other hand, the record documents trial counsel's efforts to advance the suppression motion, beginning with the May 4, 2009, motion for discovery concerning any record of complaints concerning Officer Champness' dishonesty; false, misleading, or inaccurate statements; or fabrication of evidence.  At the same time, counsel filed a motion to suppress evidence of all

16

tangible and intangible things obtained as a result of unlawful searches and seizures from petitioner's motel room. Counsel's efforts culminated in *Pitchess* hearing[9] on June 3, 2010, at which the trial court reviewed Officer Champness' personnel records *in camera*. The trial court found that Champness' personnel records revealed nothing to release. Transcript, vol. 1, at 8 (June 3, 2010).

Immediately following the *Pitchess* hearing, the trial court heard Petitioner's suppression motion. Ms. James invoked her Fifth Amendment right against self-incrimination and refused to testify. Petitioner also refused to testify. In the absence of any evidence that Officer Champness' had previously been dishonest, and having no witness to contradict Champness' testimony that the window was partially uncovered just prior to Petitioner's arrest, trial counsel withdrew the motion to suppress. Transcript, vol. 1, at 10-11 (June 3, 2010).

Having failed to establish that trial counsel's performance fell below an objective standard of reasonableness, Petitioner's insistence that, but for his attorney's inadequate assistance, Petitioner would have prevailed on the suppression motion is not persuasive.

### D.     **Conclusion**

Petitioner's claim of inadequate assistance of appellate counsel is unsupported by both facts and law.

### V.     **Certificate of Appealability**

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

///

---

[9] *See Pitchess v. Superior Court*, 11 Cal.3d 531 (1974); Cal. Penal Code §§ 832.7, 832.8.

17

    (b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

    (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

        (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

        (B)  the final order in a proceeding under section 2255.

    (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

    (3) The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court declines to issue a certificate of appealability.

//

///

///

18

## VI. Conclusion

The Court hereby DENIES the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court declines to issue a certificate of appealability. The Clerk of Court is directed to enter judgment for the Respondent.

IT IS SO ORDERED.

Dated:   **August 25, 2015**                             **/s/ Sheila K. Oberto**
                                                              UNITED STATES MAGISTRATE JUDGE